**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 CR 286 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MOHAMMAD WAQAS KHAN, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED MEMORANDUM OPINION AND ORDER**

**A.**

The Bail Reform Act's preference for liberty – a preference that is consistent with and demanded by our entire heritage – ensures that pretrial detention will occur only in the rarest of circumstances. As the Supreme Court has stressed, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Thus, 18 U.S.C. § 3142(a) and (b) require that a person charged with an offense shall be released on personal recognizance or upon execution of an unsecured appearance bond unless further conditions are necessary to reasonably assure attendance at trial and the safety of the community.

The preference for release accounts for the requirement that the judge consider the possibility of less restrictive alternatives to detention. *United States v. Infelise*, 934 F.2d 103, 105 (7th Cir. 1991)(Posner, J.). Doubts regarding the propriety of release should be resolved in the defendant's favor. *United States v. Wilbon*, 54 F.3d 788 (10th Cir. 1995); *United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991); *United States v. Barnett*, 986 F.Supp. 385, 392 (W.D. La. 1997)(collecting cases).

Thus, merely because Mr. Kahn is charged with an offense involving threats does not mean that, as a matter of law, bond cannot be granted. Indeed, there are cases involving crimes of violence or drug trafficking where bond either has been granted or where the court made clear that bond was available. *See Infelise*, 934 F.2d at 105; *United States v. Leonti*, 326 F.3d 1111, 1114 (9th Cir. 2003); *United States v. O'Dell*, 204 F.3d 829 (8th Cir. 2000); *United States v. Gigantei*, 39 F.3d 42, 48 (2nd Cir. 1994). *United States v. Ploof*, 851 F.2d 7, 11-12 (1st Cir. 1988) stressed that even where there was serious risk of obstruction, intimidation, threat, or death to prospective witness, detention still requires showing that no set of conditions will "*reasonably* assure" safety. (Emphasis in original).

Since decisions under the Bail Reform Act are discretionary, there must be a consideration of the factors relevant to that exercise, *cf., United States v. Roberson*, 474 F.3d 432, 436 (7th Cir. 2007); *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). The factors that inform bond decisions are: the nature of the circumstances of the offence charged, the weight of the evidence, the history and characteristics of the person, including whether at the time of the current offense the person was on other release pending trial under federal, state or local law, the person's family ties, length of residence in the community, appearance at court proceedings, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. §1342(g)(1)-(4).[1]

The Bail Reform Act does not require the government to show with certainty that a particular defendant poses a risk of flight or danger to the community. It recognizes that to some extent bond

---

[1] The nature and circumstances of the offense and the history and characteristics of the defendant were also factors under the sentencing guidelines. These and the other factors under 18 U.S.C. §3553(a) have been described by the Seventh Circuit as "intangibles, 'weighable' only in a metaphorical sense, that the sentencing judge is in a better position than the appellate judges to place them in the balance with competing considerations." *United States v. Gammicchia*, 498 F.3d 467, 469 (7th Cir. 2007).

decisions are exercises in uncertain prophesy. But at the same time the Act is properly premised on the theory that there is nothing inherently unattainable about a prediction of future criminal conduct, and the fact-intensive assessment of all relevant factors and the various safeguards under the Act are specifically designed to further the accuracy of that determination. *Salerno*, 481 U.S. at 751. It is significant that even the defendant in *Salerno* who had contended that the Bail Reform Act impermissibly allowing detention based on predictions of future dangerousness, conceded that an arrestee may be incarcerated until trial if he presents a danger to witnesses (or a risk of flight). 481 U.S. at 749. Thus, Mr. Khan's lawyer's statement that a judge can't say that Mr. Khan will in all probability act in a particular way in the future if flatly wrong. While the prediction, like any prediction, may be uncertain, it is a task that the Bail Reform Act mandates a judge to make.

After reviewing each of the statutory factors prescribed by the Act, the government's oral motion for detention is granted. As explained in detail at the hearing, the government has shown by clear and convincing evidence that there is no condition or set of conditions that will reasonably assure the safety of the community, and it has shown by a preponderance of the evidence that there is no condition or set of conditions that will reasonably assure the defendant's appearance at trial.

**B.**

The evidence at the detention hearing consisted in part of the defendant's own postings on his publicly available Facebook page, which were replete with unspecified death threats, which were set forth in the Complaint, issued on May 15, 2015. In brief, the defendant's Facebook postings expressed the defendant's increasing, only partly focused hostility towards American and Pakistani political figures, including Mayor Emmanuel. Since the beginning of May 2015, the posts had become increasingly threatening. For example, the defendant announced that he was going to hunt

aggressively for a "high net worth individual" to shoot over the course of the next month before he left America for Pakistan. He noted that he was not leaving America without getting "revenge" even if it cost him his life. The evidence was that the defendant had in fact purchased an airline ticket from Chicago to Pakistan departing on June 8 and returning July 20.

Other posts announced that the defendant, a naturalized American citizen born in Pakistan, had guns and other weapons, which he displayed on his Facebook page. He announced that it was time to stop moralizing and to "start fighting;" to pick up arms and raise hell. For him, fighting back was what counted. In one posting, he announced that "tonight might be a bloody night", "a murderous night." In a later posting also on May 7, he announced that he was "goin [sic] hunting tonight baby!" He said that if he saw "high-value target," he was going to "exploit it." He wanted this, he announced, "to be a real human tragedy. Much mourned." He said that he was going to "hunt aggressively tonight. Keep an eye out for ideal victims."

According to his post on May 8, 2015 the defendant boasted that he had had a good trial run that evening and that he had seen "a couple of excellent targets" that apparently fit his profile for killing. He said that "Inshallah [God willing] the deed will be done well before the deadline I have set." He stressed that when he said something, "it means I will do it. The rest is opportune timing." A week later, the defendant announced that "the gun is cocked and ready to go." He was he said going "to get my revenge, and that involves putting bullets in somebody's body ...." He again said that he was "not leaving America without getting my revenge even if it costs me my life. And that's that."

What made these rather pointed and escalating threats even more disturbing was the fact that the defendant actually had guns and other weapons, which he proudly displayed on his Facebook

4

page. Disturbingly, none of these weapons was known to his father even though the defendant was living under his father's roof.

As the June 8, 2015 departure date approached, law enforcement established surveillance outside the defense defendant's residence and followed him for several hours, noting that he picked up several "passengers" whom he drove to various locations. On May 14, 2015, the defendant was stopped by DuPage Sheriffs deputies. He acknowledged having a gun in the car – which was perfectly consistent with his assurance that he was going hunting to kill someone. The police seized it and found it to be loaded. He was taken into custody. Thereafter, according to the criminal complaint in this case, the defendant physically attacked a police officer at the station. He as arrested and criminal proceedings are ongoing in DuPage County.

### C.

None of the evidence set forth in the criminal complaint was deemed probative or significant in any way to the defendant's lawyer. While the defendant's lawyer was willing to concede that perhaps the Facebook postings were offensive, none were a real threat she said; they were no more than the kinds of speech found in rap lyrics. When questioned about which of the "threats" was the equivalent of a rapper' s work product, the defendant's lawyer was unable to answer. Even the police report from the DuPage Sheriffs department was deemed by defense counsel to be inconsequential and without evidentiary value because one didn't know if it was true. After all, she said, there is the presumption of innocence. The argument is a non-starter. Suppose the defendant had allegedly shot one of the officers. Would the presumption of innocence preclude a judicial officer from considering the charged offense in considering bond in this case because the defendant was presumed innocent. To ask the question is to answer it. The most the defendant's lawyer would

concede was that the Facebook postings might be offensive. But, she said, they were an insufficient basis upon which to deny bond. After all she said the gun found by the DuPage Sheriffs Department had been lawfully purchased and she was certain that the defendant, if released on bond, would not attempt unlawfully to purchase any gun. The basis for this clairvoyance was unexplained and in any event her certainty is of no legal significance.

When I inquired whether counsel would like a postponement so that she could call the Sheriffs deputy who made the charge against the defendant so that he could testify under oath, she not surprisingly declined, nonetheless insisting that there was no "proof" that he assaulted the officer. Perhaps, in the fullness of time, her understandably partisan, benign assessment of the encounter at the DuPage Sheriffs department will be proven accurate; but what is palpably inaccurate is that in the context of a bond hearing, the police report is not proof of anything and the defendant's speculative, uninformed, and partisan conjecture must be accepted.[2]

Moreover the encounter with the Deputy cannot be considered in isolation, but must be considered in the context of the threatening Facebook postings, which show a resolve to kill at least

---

[2] I do not in the slightest mean to suggest that a partisan presentation by a lawyer is in any way improper. After all, in our adversary system, lawyers play a partisan role. *Philips Medical Systems Intern. B.V. v. Bruetman,* 8 F.3d 600, 606 (7th Cir.1993) (Posner, J.) (Consistent with the role of an advocate in our adversary system, it is assumed that counsel "is supposed to give the evidence a partisan slant."); *Smith v. Robbins,* 528 U.S. 259, 293 (2000) (Souter, J., dissenting) ("a partisan scrutiny of the record and assessment of potential issues, goes to the irreducible core of the lawyer's obligation to a litigant in an adversary system...."). But there are limits, and the inclusion of arguments that essentially disparage any argument or evidence against one's position is unavailing and ultimately counter-productive. *See e.g. Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir. 2006)(noting "the tendency of flabby arguments...to displace more focused" ones); *Walker v, Abbott Laboratories*, 416 F.3d 641, 643 (7th Cir. 2005); *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001); *Rice v. Nova Biomedical Corp.,* 38 F.3d 908, 918 (7th Cir. 1994); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir. 1993)("A client is disserved when the most meritorious arguments are drowned in a sea of words."); Matthew Kennelly, *Over-Arguing Your Case*, 40 LITIGATION 41 (Winter 2014).

one person before the defendant returned to Pakistan in early June. Under "any realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larkin,* 421 U.S. 35, 47 (1975), I cannot conclude on the present record that Mr. Khan could or would abide by the conditions of a bond and refrain from attempting to take the action promised in his Facebook postings. From an analytical standpoint, it makes no difference that he had not yet settled on a particular target or targets. Bitter experience teaches that the kind of behavior exhibited by Mr. Khan should not be assumed to be empty fustian or unfocused and innocent or protected political expression and no more.

There is nothing upon which one can reasonably conclude that if bond were granted, Mr. Khan would or even could comport his conduct with the requirements of a bond. And while the consequences of mistakes in other cases are not decisive, they are not without some predictive capacity where like-behavior is involved. What Justice Cardozo said in another context is not without significance here: "Experience is ... available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Sinclair Refining Co. v. Jenkins Pet. Proc. Co.,* 289 U.S. 689, 698 (1933). *Compare, United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985) ("Our evaluation is guided by 'common sense and ordinary human experience.' ").

Beyond this, bond would be inappropriate in this case because there is not available an appropriate third-party custodian. Mr. Khan's mother, who supposedly is bi-polar according to her husband, is out of the country, and his father works, according to the Pretrial Services Report, 12 hours a day 6 days a week and thus would not be available to supervise his son. No other custodian has been offered.

Finally, there was a strong suggestion, if not an outright argument, that the defendant has mental health issues and that he should be released on bond so that he can enroll in a mental health program and see a psychiatrist as recommended by the Pretrial Services Officer in her Report. While the pretrial services report notes that the defendant indicated no history of mental health treatment, his mother, according to him, suffers from bipolar disorder, and his father believes his son does as well. No further explanation is offered beyond the fact that his son got into fights following the September 11, 2011 attacks on New York because he felt that the Muslim community was being targeted. Moreover, the defendant's father told the Pretrial Services Officer that the defendant has hallucinations and believes that people are out to hurt him. The defendant's father went on to give further examples of the defendant's paranoid ideation and expressed the view that since high school he feels his son has been depressed and negative. The defendant is, according to his father, verbally aggressive when angry, although he does not feel his son would be physically aggressive. He concluded his statement to the Pretrial Services Officer by saying that he feels his son is in need of mental health treatment. Yet, when asked whether she was requesting that I order a mental health examination for the defendant, Mr. Kahn's lawyer declined to have me do so, simply noting that there was a competency examination scheduled at some point in the future in the DuPage County criminal case.

In sum, having considered all of the factors under the Bail Reform Act, I find that the government has shown by clear and convincing evidence that there is no condition or set of conditions that will reasonably assure the safety of the community, and it has shown by a preponderance of the evidence that no set of conditions will reasonably assure Mr. Kahn's attendance at trial. Accordingly, the defendant's oral motion for bond is denied, and the government's oral

8

motion for detention is granted. The defendant is committed to the custody of the U.S. Marshals until further order of court.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 7/21/15