# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MOHAMMAD WAQAS KHAN

Case No. 15-cr-00286

Judge John Robert Blakey

## MEMORANDUM OPINION

On July 23, 2015, *pro se*[1] Defendant Mohammad Waqas Khan ("Defendant") was indicted for communicating a threat in violation of 18 U.S.C. § 875(c). Indictment [16]. Pending before the Court are Defendant's timely[2] pretrial motions, including: (1) Motion to Suppress Evidence [89]; (2) Motion to Dismiss the Indictment [89]; (3) Motion to Void 18 U.S.C. § 875(c) for Vagueness [89]; (4) Motion to Unseal Pertinent Documents, Subpoena Medical Records of Dr. Carl Wahlstrom, and Order Dr. Wahlstrom to Amend His Diagnosis [85]; (5) Motion to Rebuke and Sanction the Government and Defendant's Former Public Defender for Unauthorized Disclosure of Privileged Physician-Client Medical Information [85]; (6) Motion to Show Cause on Bill of Particulars [97]; (7) Motion to Compel Discovery [85]; (8) Motion to Show Cause on Subject Matter Jurisdiction [97]; (9) Motion to Dismiss for Lack of Territorial Jurisdiction [101]; and (10) Motion to Extend Trial Date [85].

---

[1] Defendant has been advised on multiple occasions of the possible perils of proceeding *pro se*. *See, e.g.,* Tr. [105] 3:18-7:5; Tr. [126] 2:15-5:25.

[2] The final deadline set by this Court for pretrial motions was January 12, 2017. *See* Minute Entry [100]. Defendant filed multiple memoranda after that date. *See, e.g.,* Def.'s Exposition on the Commerce Clause and Interstate Commerce [102]; Def.'s Amended Brief of the Commerce Clause and Interstate Commerce [109]. These briefs were properly stricken from the record, *see* Minute Entry [103, 110], and are not further discussed in this Memorandum Opinion.

The Court held an evidentiary hearing on April 12 and 13, 2017. At the evidentiary hearing, Defendant raised an additional oral motion regarding supposed destruction of exculpatory evidence. This Memorandum Opinion outlines the Court's rulings on all pending timely motions. Having considered the evidence presented, the parties' written submissions, and oral arguments, the Court makes the following findings of fact and conclusions of law:

## I. Findings of Fact

### A. The Original Tip to Law Enforcement

1. On May 13, 2015, the Illinois State Police Firearms Owners Identification ("FOID") Department received an email regarding Defendant's Facebook activities.[3] Tr. [144] 14:14-19.

2. On May 13, 2015, after receiving the email, Illinois State Police notified the Federal Bureau of Investigations ("FBI") Headquarters in Washington, D.C. *Id.* at 21:19-20.

3. On May 13, 2015, after receiving the notification from Illinois State Police, FBI Headquarters notified the FBI field office in Springfield, Illinois for further investigation. *Id.* at 21:20-23; 25:13-15.

4. On May 13, 2015, after receiving the lead from FBI Headquarters, the FBI field office in Springfield notified the FBI field office in Chicago, Illinois. *Id.* at 25:14-15, 118:5-14.

---

[3] Much has been made, particularly by Defendant, regarding the unknown source and content of the original email sent to Illinois State Police. Such questions are left unanswered by the record presently before the Court. As discussed *infra*, however, these factual ambiguities do not impact the Court's ultimate conclusions of law.

5. On May 13, 2015, upon notification from the FBI field office in Springfield, the FBI field office in Chicago assigned Special Agent Timothy Walther to investigate Defendant's Facebook activities. *Id.* at 52:5-7.

6. Timothy Walther has been employed as a Special Agent with the FBI since March 2008. Tr. [144] 11:7-10; Gov. Ex. "Warrant."

**B. Facebook**

7. Facebook is an online social media platform that can be accessed by Facebook users to post comments and photographs. Def. Ex. 35 at 3.

8. Facebook maintains servers outside the State of Illinois. *Id.* When Facebook users post comments on their Facebook profile, their messages travel across state lines to Facebook servers. *Id.* at 4.

9. Through their personal privacy and application settings, Facebook users control the extent to which content and information posted on their Facebook page is shared with other Facebook users. Def. Ex. 24 at 1.

10. By adjusting privacy and application settings, Facebook users can make content and information available only to themselves, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Gov. Ex. "Warrant."

11. When Facebook users publish content or information without privacy restrictions (also known as the "Public" setting), they allow everyone, including non-Facebook users, to access and use that information. Def. Ex. 24 at 1.

### C. Defendant's Facebook Page

12.     Defendant initially created his Facebook account in 2011.  Gov. Ex. "Warrant."

13.     On May 13, 2015, Special Agent Walther viewed Defendant's Facebook page. Tr. [144] at 53:5-8.

14.     At the time, Defendant did not have any privacy restrictions on his Facebook account, and his Facebook page was publicly viewable.  *Id*. at 53:9-14.

15.     When Special Agent Walther reviewed Defendant's Facebook page, he observed the following posts by Defendant:

> a.     At 9:22 p.m. on May 7, 2015, Defendant posted: "If I see a high value target Ima exploit it.  I'm not killin sum bum on the street.  I want a high net individual to shoot.  I want this to be a real human tragedy.  Much mourned.  I have a month.  Ima hunt aggressively tonite.  Keep an eye out for ideal victims.  If I don't catch nobody tonite then another nite." Gov. Ex. "Facebook Pages."

> b.     At 12:26 a.m. on May 8, 2015, Defendant posted: "Good dry run tonight.  Saw a couple of excellent targets.  The key is right approach and timing.  There were many potential witnesses because it was a college student night.  Inshallah[4] the deed will be done well before the deadline I have set.  Jab manay bola hai to karun ga.[5]  When I have said something, it means I will do it.  The rest is opportune timing." *Id.*

16.     Special Agent Walther also viewed photographs posted on Defendant's Facebook page.  *Id*. at 58:6-9.  Some of these photographs featured firearms.  *Id*. at 61:11-13.

---

[4] "Inshallah" is an Urdu word meaning "God willing."  Def. Ex. 35 at 7.

[5] This sentence is also written in Urdu.  *Id*. at 6.  A rough translation is, "when I say something it will be done."  *Id.*

17.     After Special Agent Walther reviewed Defendant's Facebook page, the FBI contacted Facebook, who provided an emergency disclosure of subscriber information.  Def. Ex. 35 at 4.  This information identified Defendant as a subscriber, as well as provided the static internet protocol ("IP") address that had been used to access Defendant's Facebook account.  *Id*.

18.     Special Agent Walther determined that the IP addressed used to access Defendant's Facebook account was owned and maintained by Comcast.  *Id*. The FBI contacted Comcast, who provided the FBI with subscriber information for the IP address.  *Id*. at 4-5.  The subscriber information named Mohammad Iqbal Khan, whom the FBI determined to be Defendant's father.  *Id*. at 5.  The subscriber information also listed a residential address in Glen Ellyn, Illinois.  *Id*.

**D.     Other Information Obtained by the FBI**

19.     From the Illinois Secretary of State's Office, the FBI ascertained Defendant's address to be 2N525 Pleasant Avenue, Glen Ellyn, Illinois.  Gov. Ex. "Warrant."

20.     From the Illinois FOID Department, the FBI determined that in 2014, Defendant became the registered owner of a Glock Model 19 9mm handgun, a Smith and Wesson .40 caliber semi-automatic handgun, and a Winchester 12-gage semi-automatic shotgun.  Def. Ex. 35 at 11.  Each of these firearms was depicted in the photographs posted on Defendant's Facebook page.  *Id*. at 12.

21.     The FBI also conducted a search of U.S. Custom and Border Protection travel records.  Tr. [144] 56:19-20.  From these records, the FBI learned that on

April 24, 2015, Defendant purchased an airline ticket to travel from Chicago to Karachi, Pakistan on June 8, 2015. *Id*. at 56:20-22; Gov. Ex. "Warrant."

**E.    Interviews Conducted by the FBI**

22.    Between May 13, 2015 and May 14, 2015, the FBI conducted multiple witness interviews for Defendant's investigation. Tr. [144] at 58:16-59:2.

      a. In one interview, FBI agents interviewed an individual who identified Defendant as a family friend. *Id*. at 59:19-20. The individual confirmed the location of Defendant's residence and told the FBI that Defendant possessed three weapons. *Id*. at 60:14-61:9.

      b. The second interview subject told the FBI that Defendant had a history of inflammatory comments on Facebook and confirmed that Defendant was the owner of three firearms. *Id*. at 63:14-65:1.

      c. Both individuals were also shown the photographs from Defendant's Facebook page. From these photographs, both individuals identified Defendant's bedroom, and confirmed that the firearms depicted in the photographs were identical to the firearms previously seen in the possession of Defendant. *Id*. at 61:11-62:3, 64:5-17. Additionally, both interview subjects informed the FBI that Defendant resided with his father, mother, and fourteen year-old brother. Gov. Ex. "Warrant."

**F.    Surveillance of Defendant**

23.    On the afternoon of May 13, 2015, the FBI established personal surveillance of Defendant's residence. Tr. [144] 64:24-65:1.

24.    During their surveillance on May 13, 2015, FBI agents identified Defendant leaving the residence in a silver Toyota Corolla heading eastbound into the City of Chicago. *Id*. at 65:16-20. FBI agents maintained surveillance of Defendant in his vehicle. *See id*.

25.    When Defendant reached downtown Chicago, he began picking up and dropping off passengers. *Id*. at 66:3-5. FBI agents interviewed the first individual

dropped off, who stated that she had just exited an Uber ride.[6]  *Id.* at 66:6-9.  The individual did not inform FBI agents of any suspicious or illegal activity by Defendant.  *Id.* at 81:15-17.

26.     FBI agents maintained surveillance of Defendant as he conducted approximately five to ten more Uber rides.  *Id.* at 66:9-13.

27.     At approximately midnight, FBI agents lost surveillance contact with Defendant's vehicle.  *Id.* at 66:14-67:2.  The agents returned to Defendant's residence, and arrived at approximately 1:00 a.m. on the morning of May 14, 2015.  *Id.* at 67:3-6.

28.     Upon arrival at Defendant's residence, FBI agents identified Defendant's silver Toyota Corolla parked in the driveway.  *Id.* at 67:7-10.

29.     Shortly thereafter, FBI agents were made aware of a new Facebook post on Defendant's Facebook page:

   a. At 1:11 a.m. on May 14, 2015, Defendant posted: "The gun is cocked and ready to go.  You keep sending those witnesses around and they're gona see some shit go down that they might now have signed up for. Now I'm gona get my revenge, and that involves putting bullets in someone's body, so get out of the way or I'll literally shoot at them as well and we'll end up with a much bigger scenario on our hands.  I'm not leaving America without getting my revenge even if it costs me my life.  And that's that.  You're not going to intimidate me by threatening to become a witness."  *Id.* at 67:18-23; Gov. Ex. "Facebook Pages."

30.     Following Defendant's post, the FBI established twenty-four hour surveillance of Defendant.  Tr. [144] 67:11-15.

---

[6] Uber is an internet-based ride sharing company that allows passengers to arrange transportation similar to ordering a taxi.  Gov. Ex. "Warrant."  Uber drivers use their own vehicle and often work part-time.  *Id.*

### G. The Traffic Stop and Detention of Defendant

31. Between approximately 3:00 p.m. and 5:00 p.m. on May 14, 2015, FBI Special Agent Ranjit Takher briefed deputies of the DuPage County Sheriff's Office regarding the FBI investigation of Defendant. Tr. [144] 105:15-23, 161:8-10. One of the deputies present at the briefing was Detective Patrick O'Neil. *Id.* at 161:5-7.

32. During the briefing, Special Agent Takher informed DuPage County deputies that Defendant possessed firearms and was making threatening remarks on his Facebook page. *Id.* at 106:6-20, 162:11-15; Tr. [145] 209:21-210:15. Photographs of Defendant and his firearms were also provided. *Id.* at 107:7-10, 161:11-23; Tr. [145] 210:16-211:9.

33. Special Agent Takher requested that the DuPage County Sheriff's Office conduct a traffic stop of Defendant and detain him for further questioning. *Id.* at 96:15-23, 165:8-10.

34. At the time Special Agent Takher requested the DuPage County Sheriff's Office to conduct a traffic stop, law enforcement did not possess an arrest warrant for Defendant or a search warrant for his vehicle. *Id.* at 96:24-25; Gov.'s Resp. [111] Ex. 1 at 15:2-4.

35. Following Special Agent Takher's briefing, at approximately 5:15 p.m. on May 14, 2015, Detective O'Neil waited in his squad car approximately two blocks south of Defendant's residence. Tr. [145] 211:24-212:7; Gov.'s Resp. [111] Ex. 1 at 9:22-10:8.

36. At approximately 5:45 p.m., Detective O'Neil received notification from the FBI that Defendant had left his residence in a vehicle. Tr. [145] 212:8-14; Def. Ex. 2.

37. At approximately 5:51 p.m., Detective O'Neil observed Defendant's vehicle traveling eastbound on Armitage Avenue. Tr. [145] 212:15-19; Gov.'s Resp. [111] Ex. 1 at 13:4-9. Detective O'Neil observed Defendant driving the vehicle. Tr. [145] 212:20-23.

38. Detective O'Neil stopped Defendant's vehicle at the intersection of Armitage Avenue and Pleasant Avenue. Tr. [144] 172:2-7; Tr. [145] 212:24-213:2.

39. Prior to stopping Defendant's vehicle, Detective O'Neil did not observe Defendant engage in any traffic violations. Gov.'s Resp. [111] Ex. 1 at 15:15-18.

40. After curbing Defendant's vehicle, Detective O'Neil exited his police vehicle and approached Defendant's vehicle on foot. Tr. [145] 214:1-4.

41. Detective O'Neil asked Defendant to step out of the vehicle so that Detective O'Neil could speak with him. Tr. [144] 176:7-10; Tr. [145] 214:16-19.

42. At the time Detective O'Neil asked Defendant to step out of the vehicle, Defendant was not under formal arrest.

43. After Defendant exited the vehicle, Detective O'Neil requested that Defendant walk to the back of Defendant's vehicle. Tr. [144] 178:12-15; Tr. [145] 215:8-9.

44. At approximately the time Defendant exited his vehicle, another DuPage County detective arrived at the scene. Gov.'s Resp. [111] Ex. 1 at 28:17-20.[7]

45. At the back of Defendant's vehicle, Detective O'Neil informed Defendant that he was being detained pursuant to an FBI investigation. Tr. [144] 182:1-9; Tr. [145] 214:20-22, 216:1-4.

46. Detective O'Neil then asked Defendant if he had any firearms on his person. Tr. [144] 186:4-6; Tr. [145] 216:12-13. Defendant stated that he did not. Tr. [144] 186:7-8; Tr. [145] 216:12-13.

47. Detective O'Neil then asked Defendant if he had any firearms in the vehicle. Tr. [144] 186:9-11; Tr. [145] 216:25-217:3. Defendant hesitated in answering Detective O'Neil's question. Tr. [144] 187:10-13; Tr. [145] 217:3. Upon further questioning, however, Defendant admitted that there was a 9mm Glock in the lower pocket of the driver's door. Tr. [144] 189:16-190:8; Tr. [145] 217:3-7; Def. Ex. 2.

48. Detective O'Neil asked Defendant if he possessed a concealed carry permit and if the firearm was loaded. Tr. [145] 217:10-16. Defendant stated that the firearm was loaded and that, although he possessed a FOID card, he did not have a concealed carry permit. *Id*.

49. Prior to Detective O'Neil's questioning, he did not provide Defendant with *Miranda* warnings. Gov.'s Resp. [111] Ex. 1 at 19:10-16.

---

[7] A third detective arrived approximately two minutes later. This detective, however, merely took the place of the second detective, who left the immediate area. Gov.'s Resp. [111] Ex. 1 at 28:17-29:18.

50. Prior to or during Detective O'Neil's questioning, he never: (1) brandished a firearm at Defendant; (2) placed Defendant in restraints; (3) threatened Defendant with arrest; (4) psychologically intimated Defendant; or (5) engaged in deceptive interrogation tactics.

51. At the time of Detective O'Neil's questioning, Defendant was not under formal arrest.

52. Detective O'Neil then asked Defendant for permission to retrieve the firearm from Defendant's vehicle. Tr. [145] 217:22-23. Defendant voluntarily consented. *Id.*

53. Detective O'Neil retrieved the firearm from the lower pocket of the driver's door. Tr. [145] 218:12-15. The firearm was loaded with a round in the chamber. Tr. [144] 196:19-23; Tr. [145] 219:3-5.

54. After retrieving the firearm, Detective O'Neil placed Defendant under arrest for a concealed carry violation. Tr. [145] 219:20-22.

55. Prior to transporting Defendant to the DuPage County Sheriff's Office, DuPage County detectives inventoried Defendant's vehicle and called for a tow, pursuant to DuPage County policy. *Id.* at 220:4-18.

56. During the course of their routine inventory, DuPage County detectives discovered firearm magazines loaded with ammunition. Gov.'s Resp. [111] Ex. 1 at 22:20-23-1.

## H. The Search Warrant for Defendant's Residence

57. On the evening of May 14, 2015, Special Agent Walther obtained a search warrant for Defendant's residence from Magistrate Judge Michael T. Mason in the Northern District of Illinois. Tr. [144] 67:24-68:20; Gov. Ex. "Warrant."

58. In obtaining the search warrant for Defendant's residence, Special Agent Walther presented Magistrate Judge Mason with multiple copies of the warrant. Tr. [144] 69:20-22.

59. On the top copy of the warrant, Magistrate Judge Mason noted the time that the warrant was signed: 6:40 p.m. *Id*. at 69:23-70:3. Magistrate Judge Mason did not make a similar notation on the other copies of the warrant. *Id*. at 70:7-9.

60. Once the search warrant for Defendant's residence was signed at 6:40 p.m., Special Agent Walther contacted Special Agent Takher, the on-scene commander at Defendant's residence, via telephone. *Id*. at 70:17-21. Special Agent Walther informed Special Agent Takher that a search warrant had been signed and that a search of Defendant's residence could begin. *Id*. at 70:22-24.

## I. The Search of Defendant's Residence

61. At approximately 6:47 p.m. on May 14, 2015, Special Agent Tenzin Atsatsang and Special Agent Michelle Callahan were conducting surveillance of Defendant's residence. Tr. [145] 231:21-232:7.

62. Special Agents Atsatsang and Callahan observed Defendant's father, Mohammad Iqbal, and his mother enter a vehicle in the driveway of the residence.

*Id.* at 232:13-15. Special Agents Atsatsang and Callahan approached the vehicle, identified themselves, and notified Defendant's father that the FBI had a search warrant for the residence. *Id.* at 232:15-16.

63. After Defendant's father exited the vehicle, Special Agent Atsatsang informed him of Defendant's Facebook threats. *Id.* at 232:23-233:3. The conversation occurred in both English and Urdu. *Id.* at 233:12-14.

64. Special Agent Takher arrived on the scene at approximately 6:55 p.m. Tr. [144] 107:17-21, 123:18-23. Special Agent Takher informed Defendant's parents that Defendant had been arrested by the DuPage County Sheriff's Office. *Id.* at 108:16-18, 137:12-19, 148:19-21. She further reiterated the existence of Defendant's Facebook threats and that the FBI had obtained a search warrant for the residence. *Id.* at 108:19-21, 138:1-14, 148:22-149:4.[8]

65. The search of Defendant's residence began at approximately 7:10 p.m. on May 14, 2015. *Id.* at 107:15-16; Gov. Ex. "Return."

66. During the search, FBI agents seized multiple items, including a Smith and Wesson .40 caliber semi-automatic handgun and a 12-gage Winchester semi-automatic shotgun, both of which were located underneath the bed in Defendant's bedroom. Gov. Ex. "Receipt"; Def. Ex. 35 at 14. FBI agents also seized

---

[8] During the evidentiary hearing, Special Agent Takher testified that, during this conversation, she also obtained written consent from Defendant's father to search the residence. Tr. [144] 109:1-111:23. Defendant contends that this consent was neither knowing nor voluntary, which Defendant's father supported through his testimony at the evidentiary hearing. *See id.* at 137:8-11, 142:4-5, 143:20-144:1, 149:5-150:8, 155:10-14. Although the government offered evidence to rebut this assertion, *see, e.g.,* Tr. [145] 233:17-234:11, 235:6-237:25, this Court need not, and does not, make any findings of fact or conclusions of law on the issue.

two computers located in Defendant's bedroom.  Gov. Ex. "Receipt"; Def. Ex. 35 at 14.

67.     After the search of Defendant's residence was completed, a receipt was created for the property that was seized.  Tr. [144] 73:25-74:2; Gov. Ex. "Receipt."  A copy of the receipt was provided to Defendant's father, as well as Magistrate Judge Mason.  Tr. [144] 74:3-8, 113:4-7, 114:16-17.

**J.     The Interviews of Defendant's Family**

68.     At the onset of the search of Defendant's residence, Defendant's mother, father, and brother were asked to wait outside while FBI agents cleared the residence.  Tr. [144] 112:6-10.  After the residence was cleared, FBI agents instructed Defendant's mother, father, and brother to sit in the living room.  *Id.* at 71:15-17, 112:15-17.

69.     During the search, although Defendant's mother, father, and brother were not physically restrained, they were not permitted to leave the living room without FBI supervision.  *Id.* at 112:18-20, 117:2-6, 144:20-25, 146:12-14, 152:13-23. At various points, however, Defendant's mother, father, and brother left the room under FBI supervision in order to eat and pray.  *Id.* at 153:1-3.

70.     During the course of the search, Special Agent Walther conducted separate interviews of all three individuals.  *Id.* at 71:25-72:1.  Each interview lasted for approximately 45 minutes.  *Id.* at 72:18-21.

71.     During his interview, Defendant's brother stated that he had previously shot the firearms located in Defendant's bedroom with Defendant.  Def.

Ex. 35 at 15.  Additionally, Defendant's family members stated that the computers located in Defendant's bedroom were used solely by Defendant.  *Id.*

72.  No attorney was present during Special Agent Walther's interviews, and Defendant's mother, father, and brother were not advised that they could refuse to answer any questions.  Tr. [144] 130:7-12.

### K.  Events at the DuPage County Jail

73.  At approximately 11:30 p.m. on May 14, 2015, Special Agent Walther and Special Agent Curtis Gonzales attempted to conduct an interview of Defendant at the DuPage County jail.  Tr. [144] 76:8-10.

74.  Special Agents Walther and Gonzales identified themselves to Defendant.  *Id.* at 78:8-9.

75.  Before Special Agents Walther and Gonzales asked any questions, Defendant made an approximately two-minute spontaneous oral statement.  *Id.* at 78:9-18.  Defendant's statement covered several topics, including his assertion that he had been the victim of a vast government conspiracy.  Gov.'s Resp. [111] Ex. 8.

76.  After Defendant inquired about the FBI looking at his Facebook page, Special Agents Walther and Gonzales advised Defendant of his *Miranda* rights.  Tr. [144] 78:19-22; Gov.'s Resp. [111] Ex. 8.  Defendant requested to speak to an attorney.  Tr. [144] 78:23; Gov.'s Resp. [111] Ex. 8.  Special Agents Walther and Gonzales terminated their interview at that time.  Tr. [144] 78:24; Gov.'s Resp. [111] Ex. 8.

## II.     Conclusions of Law

### A.     Defendant's Motion to Suppress Evidence [89]

Defendant challenges the constitutionality of: (1) Special Agent Walther's viewing of Defendant's Facebook page on May 13, 2015; (2) Detective O'Neil's *Terry* stop of Defendant's vehicle on May 14, 2015; (3) Detective O'Neil's questioning of Defendant during the course of the *Terry* stop; (4) Detective O'Neil's retrieval of the firearm located in Defendant's automobile; (5) Detective O'Neil's arrest of Defendant; (6) the subsequent search of Defendant's automobile that resulted in the discovery of loaded magazines; (7) the FBI's search of Defendant's home on May 14, 2015; (8) Special Agent Walther's interviews of Defendant's family during the course of the search; and (9) Special Agents Walther and Gonzales' attempted interview of Defendant at the DuPage County jail.   The Court addresses each objection in turn.

### 1.     Special Agent Walther's Viewing of Defendant's Facebook Page was Lawful

Special Agent Walther's first investigative step on May 13, 2015 was a viewing of Defendant's publicly available Facebook page.   Defendant claims that the evidence derived from this viewing should be suppressed because: (1) the government did not possess a search warrant for his Facebook account; (2) the viewing violated the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, *et seq.*; and (3) the viewing violated Facebook's "Statement of Rights and Responsibilities."

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. A Fourth Amendment "search" only occurs, however, when "the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Although a person generally has a reasonable expectation of privacy in the contents of his own personal computer, *see, e.g., United States v. Heckenkamp,* 482 F.3d 1142, 1146 (9th Cir. 2007); *United States v. Lifshitz,* 369 F.3d 173, 190 (2d Cir. 2004); *Guest v. Leis,* 255 F.3d 325, 333 (6th Cir. 2001), such an expectation may be extinguished "when a computer user disseminates information to the public through a website." *Palmieri v. United States*, 72 F. Supp. 3d 191, 210 (D.D.C. 2014) (citing *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.")). Thus, whether the Fourth Amendment applies to Facebook "partly depends on a user's privacy settings." *United States v. Adkinson*, No. 415-CR-00025-TWPVTW, 2017 WL 1318420, at *5 (S.D. Ind. Apr. 7, 2017). There is no expectation of privacy in a public Facebook page. *See, e.g., id.*; *Chaney v. Fayette Cty. Pub. Sch. Dist.*, 977 F. Supp. 2d 1308, 1316 (N.D. Ga. 2013) *United States v. Devers*, No. 12-CR-50-JHP, 2012 WL 12540235, at *2-3 (N.D. Okla. Dec. 28, 2012); *United States v. Meregildo,* 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012).

Here, at the time of Special Agent Walther's viewing, Defendant did not maintain any privacy restrictions on his Facebook account, and his Facebook profile

was viewable by any Facebook user. Hence, Defendant possessed no reasonable privacy expectation in the information found on his Facebook page. As a result, he cannot claim a Fourth Amendment violation.[9]

The Court need not address the merits of Defendant's SCA claim at length. Even if this Court were to assume a violation of the SCA, federal courts that have addressed the issue have routinely held that the SCA does not provide for a suppression remedy. *See, e.g., Huon v. Mudge*, 597 F. App'x 868, 875 (7th Cir. 2015); *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) ("Congress has made clear that it did not intend to suppress evidence gathered as a result of [SCA] violations."); *United States v. Perrine*, 518 F.3d 1196, 1201-02 (10th Cir. 2008) ("[V]iolations of the [SCA] does not warrant exclusion of evidence"); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) ("The SCA creates criminal and civil penalties, but no exclusionary remedy."); *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) ("[T]he Stored Communications Act does *not* provide an exclusion remedy. It allows for civil damages, and criminal punishment, but nothing more.") (emphasis in original) (internal citations omitted). This Court follows this well-reasoned line of cases.

Defendant's appeal to Facebook's "Statement of Rights and Responsibilities" is equally unavailing. The operative issue is whether Special Agent Walther's

---

[9] This same conclusion applies to: (1) Defendant's Facebook subscriber information; (2) the IP addresses used to access Defendant's Facebook account; and (3) Defendant's (or his father's) Comcast subscriber information. *See Huon v. Mudge*, 597 F. App'x 868, 875 (7th Cir. 2015) (holding that individual had no constitutionally protected expectation of privacy in his subscriber information); *United States v. Caira*, 833 F.3d 803, 809 (7th Cir. 2016) (holding that defendant had no reasonable expectation of privacy in his I.P. addresses).

actions violated the Fourth Amendment, not Facebook's internal policies and procedures. *See United States v. Caceres*, 440 U.S. 741, 755 (1979) (rejecting application of exclusionary rule where executive agency violated its own internal regulations); *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) ("[T]he federal exclusionary rule, which forbids the use of evidence obtained in violation of the Fourth or Fifth Amendments, does not extend to violations of statutes and regulations."); *United States v. Chaparro–Alcantara,* 226 F.3d 616, 621 (7th Cir. 2000) ("Application of the exclusionary rule is only appropriate when the Constitution or a statute requires it."). Special Agent Walther's viewing of Defendant's Facebook page, therefore, was lawful.

### 2. Detective O'Neil's *Terry* Stop of Defendant on May 14, 2015 was Lawful

Defendant claims that the traffic stop conducted by Detective O'Neil on May 14, 2015 violated the Fourth Amendment because it was not based upon reasonable suspicion, probable cause, or a valid warrant.

Under *Terry v. Ohio*, 392 U.S. 1, 21 (1968), police officers may detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013) (quoting *United States v. Carlisle,* 614 F.3d 750, 754 (7th Cir. 2010)). Reasonable suspicion "is more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (internal quotations omitted). It requires "some minimal level of objective justification for making a stop," given the

"totality of the circumstances" and "common-sensical judgments and inferences about human behavior." *Id.* (internal quotations omitted). When used by trained law enforcement officers, "objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419 (1981). Moreover, because reasonable suspicion is evaluated in light of the totality of the circumstances, "certain behavior may give rise to reasonable suspicion when viewed in the context of other factors at play." *Id.* at 824 (internal quotations omitted).

In addition, the officer involved need not be personally aware of all the facts justifying the investigatory stop. The collective-knowledge doctrine "allows one officer, when directed by other officers to stop a suspect, to rely on the aggregate knowledge of directing officers," so long as the directing officers "themselves have reasonable suspicion or probable cause" and the stop is "no more intrusive than would have been permissible for the directing officers." *United States v. Roman*, 626 F. App'x 177, 179 (7th Cir. 2015) (citing *United States v. Williams,* 627 F.3d 247, 252-53 (7th Cir. 2010)).

Here, law enforcement officers possessed reasonable suspicion that Defendant had not only communicated violent online threats, but was also actively seeking an opportunity to act them out in a violent manner. Between May 7, 2015 and May 14, 2015, Defendant's threats increased in intensity and specificity, and repeatedly referenced a one-month deadline, which agents knew corresponded to

Defendant's upcoming international flight to Pakistan. Defendant promised that he would carry out his threat even at the cost of his own life, and reiterated that witnesses would not deter him. On May 14, 2015, just hours before Detective O'Neil's stop, Defendant posted: "The gun is cocked and ready to go. . . . Now I'm gona [sic] get my revenge, and that involves putting bullets in someone's body." These posts were accompanied by photographs of multiple firearms that FBI agents confirmed were owned by Defendant.

It was also reasonable for law enforcement to suspect that Defendant might execute his threats *while driving a vehicle*. On May 7, 2015, Defendant posted that he was going to "hunt aggressively" and "[k]eep an eye out for ideal victims." One day later, he posted that he had been on a "[g]ood dry run" and that he had indeed identified "a couple of excellent targets." Defendant posted his last threat on May 14, 2015, shortly after transporting numerous Uber passengers in the City of Chicago.

These circumstances, taken together, gave Detective O'Neil more than reasonable suspicion to stop Defendant as he drove his vehicle from his home on the evening of May 14, 2015. They further justified Detective O'Neil's request for Defendant to step out of his car and accompany him to the back of the vehicle. *See Pennsylvania v. Mimms,* 434 U.S. 106, 110-11 (per curiam); *United States v. Spotts*, 275 F.3d 714, 719 n. 2 (8th Cir. 2002) ("Officers who have conducted a lawful *Terry*

stop of a vehicle may order the driver to exit the vehicle pending completion of the stop."); *United States v. Ibarra–Sanchez,* 199 F.3d 753, 761 (5th Cir. 1999).[10]

### 3. Detective O'Neil's Questioning of Defendant was Lawful

After Defendant exited his car and followed Detective O'Neil to the back of his vehicle, Detective O'Neil informed Defendant that he was being detained pursuant to an FBI investigation. Detective O'Neil then inquired as to whether: (1) there were firearms on Defendant's *person* (to which Defendant stated no); (2) there were firearms in Defendant's *vehicle* (to which Defendant eventually stated yes); (3) Defendant possessed a concealed carry permit (Defendant stated no); and (4) the firearm was loaded (Defendant stated yes). Detective O'Neil did not preface his questioning with *Miranda* warnings. Defendant claims that this omission—which preceded Detective O'Neil's retrieval of the loaded 9mm Glock—violated Defendant's Fifth Amendment right against self-incrimination.

Under *Miranda v. Arizona,* 384 U.S. 436 (1966), the admissibility of a custodial statement is conditioned upon a precedent warning from law enforcement regarding the suspect's rights against self-incrimination. Failure by law enforcement to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). *Miranda* only applies, however, to

---

[10] In support of his Motion to Suppress [89], Defendant cites a state court ruling (based upon a less-detailed factual record than the one presented here) that found Detective O'Neil's traffic stop unlawful. This Court, however, is not bound by a state court's rulings on matters of federal law. *Calvin v. Sheriff of Will Cty.*, 405 F. Supp. 2d 933, 940 (N.D. Ill. 2005), *amended*, No. 03-cv-3086, 2006 WL 1005141 (N.D. Ill. Apr. 14, 2006); *Finch v. Ford Motor Co.*, 327 F. Supp. 2d 942, 945 (N.D. Ill. 2004) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997)).

"custodial interrogation." *U.S. ex rel. Church v. De Robertis*, 771 F.2d 1015, 1018 (7th Cir. 1985). The question here, therefore, is whether Defendant was "in custody" for the purposes of *Miranda* when Detective O'Neil asked about the presence of firearms.

Used within the context of *Miranda*, "custody" is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v. California,* 511 U.S. 318, 322-323 (1994) (per curiam)*,* there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles,* 467 U.S. 649, 655 (1984)). Of course, "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle." *Berkemer v. McCarty,* 468 U.S. 420, 436 (1984). Indeed, under the law of most states, "it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission. Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Id.*

The Supreme Court has declined, however, to "accord talismanic power" to the freedom-of-movement test. *Id.* at 437. In other words, a significant restriction on freedom of movement "identifies only a necessary and not a sufficient condition

for *Miranda* custody." *Shatzer*, 559 U.S. at 112. This is because fidelity to the doctrine announced in *Miranda* "requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer*, 468 U.S. at 437. Thus, the ultimate question is whether the environment in which law enforcement questioning occurs "exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.*

In the context of the roadside questioning of a motorist detained pursuant to a traditional *Terry* or traffic stop, the Supreme Court has answered this question in the negative. *Berkemer*, 468 U.S. at 439. According to the *Berkemer* Court, two features of a traditional traffic stop "mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely":

> First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.

> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding

whether to issue a citation, in combination, exert some
pressure on the detainee to respond to questions. But
other aspects of the situation substantially offset these
forces. Perhaps most importantly, the typical traffic stop
is public, at least to some degree. Passersby, on foot or in
other cars, witness the interaction of officer and motorist.
This exposure to public view both reduces the ability of an
unscrupulous policeman to use illegitimate means to elicit
self-incriminating statements and diminishes the
motorist's fear that, if he does not cooperate, he will be
subjected to abuse. The fact that the detained motorist
typically is confronted by only one or at most two
policemen further mutes his sense of vulnerability.

*Id.* at 438 (internal citations and quotations omitted). The Court went on to say

that in "both of these respects," the usual traffic stop is analogous to a typical *Terry*

stop, where an officer "may ask the detainee a moderate number of questions to

determine his identity and to try to obtain information confirming or dispelling the

officer's suspicions." *Id.* at 439. The detainee, however, "is not obliged to respond,"

and unless the detainee's answers "provide the officer with probable cause to arrest

him, he must then be released." *Id.* at 440. The Court found that the

"comparatively nonthreatening character" of such detentions explained "the absence

of any suggestion in [the Court's] opinions that *Terry* stops are subject to the

dictates of *Miranda*." *Id.*; *see also Shatzer*, 559 U.S. at 113 ("[T]he temporary and

relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not

constitute *Miranda* custody.") (internal citation omitted); *United States v. Saadeh*,

61 F.3d 510, 519 (7th Cir. 1995); *United States v. Burns*, 37 F.3d 276, 281 (7th Cir.

1994); *United States v. Boden*, 854 F.2d 983, 993 (7th Cir. 1988).

Of course, if a detained individual "is subjected to treatment that renders him 'in custody' for practical purposes," he is entitled "to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440. There is no bright-line rule for such a determination; rather, it "should focus on all of the features of the interrogation," *Howes v. Fields*, 565 U.S. 499, 514 (2012), including the location of the questioning (and, by extension, the degree of police control over the environment); its duration; statements made during the interview; the presence or absence of physical restraints; whether the suspect has been made aware of his right to refrain from answering questions; whether there has been coercive and accusatory questioning; and whether police have employed subterfuge in order to induce self-incrimination. *Id.*; *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996).

Analyzing the present case under this framework, this Court concludes that Defendant was not "in custody" for *Miranda* purposes when Detective O'Neil questioned him at the back of Defendant's vehicle. Only a brief period of time elapsed between the initial stop and the time Defendant was questioned. *See Berkemer*, 468 U.S. at 441; *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996). The encounter took place during daylight hours on a residential street in public view. *See Murray*, 89 F.3d at 462. Only two law enforcement officers were present, *see Buchler*, 79 F.3d at 641, and there is no evidence that they engaged in conduct which might have overborne Defendant's will. *See Murray*, 89 F.3d at 462. The number of questions was "moderate," and aimed at "confirming or dispelling" Detective O'Neil's suspicion that Defendant might be armed, either on his person or

in his vehicle.  *See Berkemer*, 468 U.S. at 439.  Considering the totality of these circumstances, the Court finds that a reasonable person in Defendant's position "would not have considered the brief questioning at the scene to be a custodial interrogation."  *Murray*, 89 F.3d at 462.  Detective O'Neil's questioning, therefore, was lawful.

### 4.    The Seizure of the Firearm in Defendant's Vehicle was Lawful

Detective O'Neil's limited search of Defendant's vehicle in order to seize the 9mm Glock was also constitutional.  There are multiple theories upon which this Court bases this finding.  First and foremost, Defendant consented to the minor intrusion into his vehicle.  Consent "lifts the warrant requirement" of the Fourth Amendment as long as the consent is voluntary.  *United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991); *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) ("A well-recognized exception to the warrant requirement applies, however, when someone consents to a search.").  The test for "voluntariness" is "a factual one" that requires an examination "of all the circumstances in which consent was given."  *Id.* (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973)).  As discussed *supra*, the atmosphere surrounding Defendant's consent was not coercive.  Although Defendant objects to Detective O'Neil's failure to advise him of his right to refuse, the "failure to inform a suspect of his right to refuse to consent to a search does not invalidate a consent that is

voluntary." *United States v. Baker,* 78 F.3d 1241, 1245 (7th Cir. 1996).  Accordingly, his consent was legally valid.[11]

Aside from consent, Detective O'Neal's actions also constituted a lawful search incident to his *Terry* stop.  An officer "with a reasonable suspicion that a motorist may be armed and may be able to gain immediate control of weapons may conduct a protective search of the passenger compartment of the vehicle without a warrant." *United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004) (citing *Michigan v. Long,* 463 U.S. 1032, 1049 (1983)); *United States v. Leiva*, 821 F.3d 808, 817 (7th Cir. 2016) (holding that police officer may search automobile without a warrant "if there is reasonable suspicion that an occupant of the car possesses or the car itself contains accessible weapons").  This remains true where, as here, the motorist has been moved away from the vehicle.  *See United States v. Boden*, 854 F.2d 983, 994 (7th Cir. 1988) ("It is not disputed that Boden told [the officer] that there might be a weapon in his car.  Given that Boden was not under arrest and none of the agents were restraining him, [the officer] had an articulable suspicion that Boden could gain control of a weapon.  Therefore, [the officer] could search in the passenger compartment for that weapon. . . . [W]hile [the officer] could have *and in fact did* move Boden away from the station wagon, there was still a continuing possibility that Boden could reenter it, as he was not under arrest.") (emphasis added).

---

[11] Notably, this conclusion remains even assuming, *arguendo*, that Defendant was actually "in custody" at the time consent was given.  A consent to search "can be voluntary—and therefore Fourth-Amendment-compliant—notwithstanding the fact that it was given while a defendant was in custody without having received *Miranda* warnings."  *United States v. Renken*, 474 F.3d 984, 987 (7th Cir. 2007).

Here, Detective O'Neil possessed not only reasonable suspicion, but *probable cause* to believe Defendant was armed. Probable cause exists "when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Richards,* 719 F.3d 746, 754 (7th Cir. 2013) (internal quotations omitted); *see also Illinois v. Gates*, 462 U.S. 213, 231 (1983) (stating that probable cause "does not deal with hard certainties, but with probabilities"); *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (holding that although probable cause requires "something more than a hunch," it does not require a finding "that it was more likely than not" that an individual has engaged in unlawful activity). As discussed at length above, the fruits of the FBI's detailed investigation and Defendant's admissions at the scene generated probable cause for Detective O'Neil to believe that Defendant's vehicle contained a loaded firearm that constituted evidence of several criminal offenses. *See Leiva*, 821 F.3d at 817.

Given the existence of probable cause, Detective O'Neil's limited search of Defendant's automobile is further supported by the automobile exception to the Fourth Amendment's warrant requirement. Under that exception, police do not need a warrant to search a vehicle when they have probable cause to believe it contains evidence of criminal activity. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014).

### 5.     Detective O'Neil's Arrest of Defendant was Lawful

A "warrantless arrest, like a warrantless search, must be supported by probable cause." *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996). Probable cause to justify an arrest exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). Once again, this is a "purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Id.* In other words, although the Court "focuses on what the officer knew at the time of the arrest," it must determine "whether those facts and circumstances, 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" *Id.* (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)). If this test is met, an officer may arrest the offender without violating the Fourth Amendment, even if the individual has only committed "a very minor criminal offense." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Here, Defendant possessed a functional, accessible, loaded, unenclosed firearm in his vehicle. At the same time, Defendant did not hold a valid concealed carry permit. Under the totality of circumstances in this case, an objectively reasonable officer possessed probable cause to believe that Defendant had committed several criminal offenses, including but not limited to an unlawful use of

a weapon. *See* 720 ILCS § 5/24-1(a)(4) ("Unlawful Use of Weapons"). Thus, Defendant's arrest was lawful.

### 6.  The Search of Defendant's Automobile was Lawful

Prior to transporting Defendant to the DuPage County Sheriff's Office, DuPage County detectives inventoried Defendant's vehicle and called for a tow, pursuant to DuPage County policy. During the course of their routine inventory search, DuPage County detectives discovered loaded magazines. Defendant contests the lawfulness of DuPage County's impoundment and inventory procedure. Specifically, Defendant argues that impoundment was unnecessary because, given the location of Detective O'Neil traffic stop, his vehicle could have either been quickly retrieved by a nearby family member or merely left on the side of the residential street.

It has long been recognized that a vehicle impoundment and inventory search may "constitute a well-recognized exception to the warrant requirement." *United States v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010) (citing *South Dakota v. Opperman,* 428 U.S. 364, 376 (1976)). Police departments routinely inventory and secure the contents of impounded automobiles, because doing so generally "protects the police from potential danger, protects the owner's property while it remains in police custody, and protects the police against claims of lost, stolen, or damaged property." *Id.* at 613-14.

Warrant exception aside, however, both "the decision to take the car into custody *and* the concomitant inventory search must meet the strictures" of the

Fourth Amendment's reasonableness requirement. *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996) (emphasis added). On this score, "the decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory (the 'search')." *Id.* Typically, the decision to impound, "unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." *Id.* at 353. As one might expect, the results of such an analysis vary widely depending upon the specific facts of a particular case. *Compare id.* at 351-54 (finding decision to impound unreasonable and suppressing evidence found during the course of subsequent inventory search) *and Thompson v. Vill. of Monee*, 110 F. Supp. 3d 826, 846-50 (N.D. Ill. 2015) (finding decision to impound unreasonable) *with Cartwright*, 630 F.3d at 613-16 (affirming reasonableness of both impoundment and inventory).

Ultimately, this Court need not conduct its own impoundment and inventory analyses for this case, since DuPage County's search of Defendant's vehicle following his arrest was separately supported by probable cause. *See Richards,* 719 F.3d at 754. By that point, officers not only knew the details of the FBI's investigation into Defendant's online threats, but had also discovered a loaded 9mm handgun in the driver's door of Defendant's vehicle. By extension, law enforcement possessed probable cause to believe that the passenger compartment might contain the very thing that was ultimately found: additional weapons or ammunition. Pursuant to the automobile exception, this probable cause search did not require a

search warrant.  *See United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014).

DuPage County's search of Defendant's vehicle and seizure of the loaded magazines,

therefore, was lawful.

### 7. The Search of Defendant's Home on May 14, 2015 was Lawful

Where a search "is undertaken by law enforcement officials to discover

evidence of criminal wrongdoing, reasonableness generally requires the obtaining of

a judicial warrant." *United States v. Jenkins*, 850 F.3d 912, 917 (7th Cir. 2017)

(internal quotations and modifications omitted).  A warrant "is a judicial mandate

to an officer to conduct a search or make an arrest." *United States v. Leon,* 468 U.S.

897, 920 n. 21 (1984).  The purpose of a search warrant "is twofold: to show that a

judicial officer authorized the search, and to indicate to the government agents who

will execute the warrant what the limits of the authorization are." *United States v.

Torres*, 751 F.2d 875, 886 (7th Cir. 1984).  The Fourth Amendment requires that a

warrant "be supported by probable cause and that it describe, with particularity,

the place to be searched and the items or persons to be seized." *Id.*  Moreover,

absent exigent circumstances, "a neutral magistrate must make the probable-cause

determination and issue the warrant." *Id.* (citing *Chambers v. Maroney,* 399 U.S.

42, 90 (1970); *Jones v. Wilhelm,* 425 F.3d 455 (7th Cir. 2005)).

Defendant first alleges that the FBI searched his residence without a

warrant.  Defendant's assertion, however, is undermined by the evidence presented

at the evidentiary hearing.  Special Agent Walther obtained a search warrant from

Magistrate Judge Mason at 6:40 p.m. on May 14, 2015.  The search of Defendant's

residence did not begin until approximately 7:10 p.m., after Special Agent Walther contacted Special Agent Takher via telephone and informed her that a warrant had been secured.

In the alternative, Defendant alleges that the warrant submitted by the government is a forgery. This accusation, however, is wholly unsupported by the record and rejected by this Court.

Defendant next argues that even if the warrant was not forged, it was not sufficiently supported by probable cause. Specifically, Defendant takes issue with the fact that Special Agent Walther's supporting affidavit failed to reference the initial tip provided to the Illinois State Police FOID Department. Defendant claims that as a result of this omission, Magistrate Judge Mason never independently evaluated the credibility and reliability of the informant upon whom law enforcement relied for information. Indeed, where an affidavit submitted in support of a search warrant relies upon information supplied by an informant, the probable cause inquiry "generally focuses on the informant's reliability, veracity, and basis of knowledge." *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010). In drafting his search warrant application in this case, however, Special Agent Walther did not rely upon the initial tip provided to the Illinois State FOID Department. Instead, Special Agent Walther relied upon the results of the FBI's own *independent* investigation of Defendant in the days before May 14, 2015. *See* Gov. Ex. "Warrant." As a result, the reliability of the initial tip to Illinois State

Police is irrelevant to Magistrate Judge Mason's ultimate probable cause determination.

Defendant also claims that the search warrant for his residence was overly broad. He asserts that the warrant impermissibly authorized the FBI to "rummage" through his house and seize all documents and physical objects "of any kind." Def.'s Mot. [93] 10. The particularity requirement of the Fourth Amendment "protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the warrant, or permit seizure of items other than what is described." *United States v. Clark*, 754 F.3d 401, 410 (7th Cir. 2014); *United States v. Aljabari*, 626 F.3d 940, 947 (7th Cir. 2010) (stating that the particularly requirement "helps enforce the probable cause requirement by limiting law enforcement officers' discretion to determine for themselves the scope of their search."). Contrary to Defendant's assertions, however, the warrant at issue here was sufficiently particular. It listed the precise place to be searched (Defendant's residence) as well as the items to be seized. *See* Gov. Ex. "Warrant." Far from sanctioning the wholesale seizure of any article found in Defendant's home, the warrant is limited to items related to Defendant's on-line violation of 18 U.S.C. § 875(c).

Finally, Defendant argues that the warrant for his residence was defective because it does not list the "date and time the warrant was executed; the executing officer's signature, name, or date; [or] the inventory of the property taken." Def.'s Mot. [93] 10-11. Such information, however, is provided on the warrant *return*,

*after* the search authorized by the warrant itself has been executed. As such, its absence cannot logically impact the legitimacy of the predicate search authorization. *See, e.g. United States v. Motz,* 936 F.2d 1021 (9th Cir. 1991) (holding that failure to list 725 marijuana plants on search warrant return and filing the return ten weeks after the search was not a basis to suppress evidence of the marijuana plants); *United States v. Clark,* 934 F.2d 322 (6th Cir. 1991) (holding that absent a showing of prejudice, the failure to return the search warrant (including the inventory) as required by state law was not a basis for granting motion to suppress); *United States v. Burroughs,* 882 F. Supp. 2d 113, 125 (D.D.C. 2012) (denying motion to suppress evidence where warrant return was not signed until over three months after the warrant was executed).

In sum, Defendant's motion to dismiss evidence seized from his residence on May 14, 2015 is denied.[12]

### 8. The FBI's Interviews with Defendant's Family on May 14, 2015 are Admissible

Defendant asserts that the FBI's interviews of his family during the execution of the search warrant for his home were unconstitutional. The Court need not reach the merits of Defendant's claim because he lacks standing to bring it in the first instance. Generally, "individuals not personally the victims of illegal government activity cannot assert the constitutional rights of others." *United States v. Chiavola,* 744 F.2d 1271, 1273 (7th Cir. 1984) (citing *United States ex rel.*

---

[12] Because this Court rules that the search warrant authorized by Magistrate Judge Mason satisfies the Fourth Amendment, it need not address the government's alternative argument that Defendant's father knowingly and voluntarily consented to the search of Defendant's residence.

*Cunningham v. DeRobertis,* 719 F.2d 892, 895-96 (7th Cir. 1983)). This "is clearly true in the Fourth Amendment context." *DeRobertis*, 719 F.2d at 895. Although a violation of a non-defendant's *Fifth Amendment* rights may result in a fundamentally unfair trial for the defendant "when the government seeks a conviction through use of evidence obtained by extreme coercion or torture," *Chiavola,* 744 F.2d at 1273, Defendant has not presented any evidence that the government's actions rose to that level of misconduct. Although Defendant's mother, father, and brother were generally not permitted to leave their living room without FBI supervision during the search (for safety reasons), they also were not physically restrained, and at various points were permitted to leave in order to eat and pray. Special Agent Walther's interviews only lasted for approximately 45 minutes each, and Defendant has adduced no evidence of coercive tactics. Defendant's motion to suppress his family's statements at trial, therefore, is denied.

9. **Defendant's Spontaneous Statements to Special Agents Walther and Gonzales at DuPage County Jail are Admissible**

Finally, although Defendant was certainly "in custody" at DuPage County Jail, not "all statements obtained by the police after a person has been taken into custody are considered the product of interrogation." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). By "its own terms, *Miranda* does not apply to volunteered statements." *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990); *see also United States v. Abdulla*, 294 F.3d 830, 835 (7th Cir. 2002). Statements are volunteered "when they are not the result of 'compelling influences, psychological

ploys, or direct questioning.'" *Hendrix*, 509 F.3d at 374 (quoting *Arizona v. Mauro,* 481 U.S. 520, 529 (1987)). Special Agents Walther and Gonzales' mere act of identifying themselves as law enforcement does not qualify as any of these exceptions. Accordingly, Defendant's statements are admissible.

## B. Defendant's Motion to Dismiss the Indictment [89]

Defendant next moves to dismiss his indictment because, according to Defendant: (1) inadmissible evidence was presented to the grand jury; (2) the government's witnesses perjured themselves before the grand jury; (3) the government failed to inform the grand jury of the FBI's role in Defendant's initial arrest; (4) the prosecution of Defendant was arbitrary, selective, and discriminatory; and (5) Defendant's actions do not satisfy the elements of the offense charged. Once again, the Court addresses Defendant's protests in turn.

### 1. Defendant Has Not Shown Errors in His Grand Jury Proceedings that Resulted in Prejudice

Defendant's first three objections can be fairly characterized as alleged errors in his grand jury proceedings. *See* Fed. R. Crim. P. 12(b)(3)(A)(v). From the outset, it must be noted that "because the grand jury is an institution separate from the courts, over whose functioning the courts do not preside," *see United States v. Williams,* 504 U.S. 36, 47 (1992), courts "generally do not exercise supervisory authority over grand jury proceedings." *United States v. O'Neill*, 52 F. Supp. 2d 954, 969 (E.D. Wis. 1999), *aff'd sub nom. United States v. Warneke*, 199 F.3d 906 (7th Cir. 1999); *see also United States v. Udziela*, 671 F.2d 995, 999 (7th Cir. 1982) ("Strictly speaking, the grand jury is a constitutional fixture in its own right,

belonging to neither the executive nor the judicial branch . . . we must [therefore] take care not to encroach on legitimate executive activities before the grand jury."). Thus, a district court "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997) (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254 (1988)); *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005). "Prejudice" only occurs "when the alleged violation had a substantial effect on the grand jury's decision to indict or when it was quite doubtful that the decision to indict was free from that violation's considerable influence." *Brooks*, 125 F.3d at 498.

Defendant believes that his grand jury proceedings were tainted because the government presented inadmissible evidence and perjured testimony. The Court disagrees. As discussed at length *supra*, this Court finds that all of the evidence attacked by Defendant was obtained through constitutional means, and Defendant has failed to introduce *any* evidence showing that a government witness committed perjury during the grand jury proceedings. Regardless, the Seventh Circuit has held that the jury may act upon evidence obtained in violation of a defendant's Fourth and Fifth Amendment rights so long as such violation was not "at the hands" of the grand jury returning the indictment. *United States v. Puglia*, 8 F.3d 478, 482 (7th Cir. 1993) (citing *Lawn v. United States,* 355 U.S. 339, 348 (1958)); *see also Bracy v. United States*, 435 U.S. 1301, 1302 (1978) ("While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of that

factfinding process, its introduction before the grand jury poses no such threat."). Defendant's attack on this front therefore fails.

The government's alleged failure to reveal the FBI's role in Defendant's initial arrest, even if assumed to be true, is equally insignificant. The primary purpose of a grand jury is to determine whether there is probable cause to charge an individual with a crime. *See United States v. Dionisio*, 410 U.S. 19, 48 (1973); *Henry v. Ryan*, 775 F. Supp. 247, 254 (N.D. Ill. 1991). The involvement of a particular law enforcement agency (here, the FBI) in a specific investigatory action (Defendant's arrest) has no bearing upon the probable cause question.

### 2. Defendant Has Not Made a Showing of Selective Prosecution

Defendant next argues that the indictment should be dismissed because the government improperly targeted him "despite the existence of many other unindicted individuals who have engaged in the same type of activity with which [Defendant] is charged." *United States v. Finley*, 705 F. Supp. 1297, 1302 (N.D. Ill. 1988).

An exercise of prosecutorial discretion, however, "cannot be successfully challenged" merely on the ground that it is supposedly "irrational or arbitrary." *United States v. Moore*, 543 F.3d 891, 900 (7th Cir. 2008); *United States v. Smith,* 953 F.2d 1060, 1063 (7th Cir. 1992) ("Arbitrariness—that is, unjustified disparities in the treatment of similarly situated persons—is not among the grounds on which to contest an exercise of prosecutorial discretion."). Likewise, the "mere conscious exercise of some selectivity in enforcement is not in itself a federal constitutional

violation." *United States v. Niemiec*, 611 F.2d 1207, 1209 (7th Cir. 1980) (internal quotations omitted). Indeed, selectivity "is not only inevitable but also desirable when it conserves resources." *Falls v. Town of Dyer, Ind.*, 875 F.2d 146, 148 (7th Cir. 1989). The government "rationally may decide that imposing stiff penalties on 10% of offenders is the best way to enforce the law against all." *Id.*

Courts generally presume "that prosecutors faithfully and lawfully discharge their constitutional duties and, in the ordinary case, prosecutors have significant discretion to determine whether or not to prosecute." *United States v. Blake*, 415 F.3d 625, 627 (7th Cir. 2005); *see also United States v. LaBonte,* 520 U.S. 751, 762 (1997) (noting that prosecutorial discretion is an "appropriate" and "integral feature of the criminal justice system"); *United States v. Armstrong,* 517 U.S. 456, 464 (1996) ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Such discretion is, of course, "subject to constitutional restraints, and cannot be based upon invidious criteria." *Moore*, 543 F.3d at 900; *Armstrong*, 517 U.S. at 464. That is, the decision to prosecute "may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464 (quoting *Oyler v. Boles,* 368 U.S. 448, 456 (1962)). To show that the government engaged in improper selective prosecution, however, Defendant must demonstrate that the prosecutorial decision "had a discriminatory effect and that it

was motivated by a discriminatory purpose." *Id.* (quoting *Wayte v. United States,* 470 U.S. 598, 608, (1985)). In other words, Defendant must show "that other similarly situated individuals were not prosecuted, and that his prosecution was motivated by discrimination." *United States v. Flores-Flores*, 42 F. App'x 868, 870 (7th Cir. 2002).

Despite his allegations, Defendant here has shown neither. Defendant offers no evidence to support the inference that the government opted to prosecute him because of his "religious, national, [or] political background." Def.'s Mot. [89] at 43-44. Moreover, although Defendant's motion references several notable public figures who have made inflammatory statements without subsequent criminal prosecution—including militia leader Michael Brian Vanderboegh, mixed-martial artist Conor McGregor, and Governor Paul LePage of Maine—it fails to prove how such individuals are similarly situated to Defendant. This is not enough.

### 3. Whether Defendant's Actions Satisfy the Elements of the Offense Charged is a Matter for Trial

Finally, Defendant claims that the indictment should be dismissed because, in Defendant's view, his actions do not satisfy the elements of the offense charged. In particular, Defendant challenges the government's position that his Facebook postings constituted immediate "true threats" rather than constitutionally protected speech. The Supreme Court, however, "has often recognized the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime." *Kaley v. United States*, 134 S. Ct. 1090, 1097 (2014). The "grand jury gets to say—without any review, oversight, or second-guessing—whether

42

probable cause exists to think that a person committed a crime." *Id.* at 1098. For this reason, a "sufficient indictment returned by a legally constituted and unbiased grand jury is enough to call for a trial on the merits." *United States v. Lee*, No. 12-cr-109, 2017 WL 56630, at *1 (N.D. Ill. Jan. 5, 2017) (citing *Costello v. United States*, 350 U.S. 359, 362 (1956)). Thus, "while an indictment may be dismissed if subject to a defense that raises only a question of law, a defense relating to the strength of the government's evidence ordinarily must wait for trial." *Id.*

In sum, Defendant's Motion to Dismiss the Indictment [89] is denied.

### C. Defendant's Motion to Void Title 18 U.S.C. § 875(c) for Vagueness [89] is Unavailing

Defendant argues that the statute under which he is charged, 18 U.S.C. § 875(c), is unconstitutionally vague. According to Defendant, an individual "cannot know with any certainty which statements are acceptable and which he is supposed to avoid." Def.'s Mot. [85] 46. Defendant claims this uncertainty "leaves the door open for arbitrary and selective justice." *Id.* at 47.

To satisfy due process, a penal statute must define the criminal offense: (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) in a manner that does not encourage arbitrary and discriminatory enforcement. *Skilling v. United States,* 561 U.S. 358, 402-03 (2010). A statute "that does not provide 'fair notice' of what 'conduct is forbidden' or 'is so indefinite that it encourages arbitrary and erratic arrests and convictions' is deemed void for vagueness." *United States v. Sylla*, 790 F.3d 772, 774 (7th Cir. 2015) (quoting *Colautti v. Franklin,* 439 U.S. 379, 390 (1979)).

The language of the statute at issue here reads as follows:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c).

Because § 875(c) criminalizes "pure speech," the speech involved must constitute a "true threat" and not constitutionally protected speech. *United States v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005). Until recently, most courts, including the Seventh Circuit, held that to establish a "true threat," the government was required to prove that the statement came "in a context or under such circumstances wherein *a reasonable person would foresee* that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon or to take the life of another individual." *Id.* (emphasis added) (internal quotations and brackets omitted). In other words, whether something constituted a "true threat" was "an objective inquiry . . . not dependent upon what the defendant intended, but whether the recipient could reasonably have regarded the defendant's statement as a threat." *Id.* (internal citations and quotations omitted); *see also United States v. White*, 670 F.3d 498, 510 (4th Cir. 2012); *United States v. Francis*, 164 F.3d 120, 122 (2d Cir. 1999); *United States v. Whiffen,* 121 F.3d 18, 21 (1st Cir. 1997); *United States v. Himelwright,* 42 F.3d 777, 782-83 (3d Cir. 1994); *United States v. DeAndino*, 958 F.2d 146, 149-50 (6th Cir. 1992); *but see United States v. Twine,* 853 F.2d 676, 680

(9th Cir. 1988).  Even under this "general intent" standard, multiple courts declined to void § 875(c) for vagueness.  *See, e.g., United States v. Martinez*, No. 10-60332-CR, 2011 WL 1099261, at *7 (S.D. Fla. Mar. 22, 2011); *United States v. Tiller*, No. CRIM.A. 07-50067, 2008 WL 4690511, at *1 (W.D. La. Oct. 21, 2008).

In 2015, however, the Supreme Court held that a defendant may not be convicted of violating § 875(c) based "solely on how his [words] would be understood by a reasonable person."  *Elonis v. United States*, 135 S. Ct. 2001, 2011 (2015).  Rather, to violate § 875(c), a defendant must transmit a communication: (1) for the purpose of issuing a threat; (2) with knowledge that the communication will be viewed as a threat; or possibly (3) with reckless disregard for the likelihood that the communication would be perceived as a threat.[13]  *Id.* at 2012.  At least one circuit court has still found § 875(c) sufficiently definite under this specific intent standard.  *See United States v. Sutcliffe*, 505 F.3d 944, 953-54 (9th Cir. 2007).  Indeed, in the eyes of the Ninth Circuit, "rather than making the statute void for vagueness, the narrowing construction . . . actually alleviates possible void-for-vagueness concerns. . . . An ordinary citizen can understand what is meant by the terms 'threat to kidnap' and 'threat to injure,' and we are persuaded that the statute provides sufficient standards to allow enforcement in a non-arbitrary manner."  *Id.*; *see also United States v. Yassin*, No. 16-03024-01-CR-S-MDH, 2017 WL 1324141, at *6 (W.D. Mo. Feb. 23, 2017), *report and recommendation adopted*, No. 16-3024-01-

---

[13] The *Elonis* Court explicitly left open whether a finding of recklessness would be sufficient.  135 S. Ct. at 2012.

CR-S-MDH, 2017 WL 1337438 (W.D. Mo. Apr. 6, 2017). This Court agrees, and Defendant's motion is therefore denied.

### D. Defendant's Motion to Show Cause on Bill of Particulars [97]

In his motion for a bill of particulars, Defendant requests an order directing the government to disclose the specific targets of Defendant's purported threats. Under Federal Rule of Criminal Procedure 7(f), this Court indeed has the power to direct the government to file a bill of particulars. The purpose of a bill of particulars, however, "is to provide the defendant with the information necessary to prepare a defense." *United States v. Finley,* 705 F. Supp. 1272, 1277-78 (N.D. Ill. 1988) (internal citation omitted). A defendant "is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." *United States v. Kendall,* 665 F.2d 126, 135 (7th Cir. 1981) (internal quotations omitted). Accordingly, a bill of particulars is necessary "only where the indictment does not sufficiently apprise the defendant of the charges to enable her to prepare for trial." *United States v. Esteves*, 886 F. Supp. 645, 646 (N.D. Ill. 1995); *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008). Information relevant to the preparation of a defense "includes the elements of each charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the statute or statutes violated." *Blanchard*, 542 F.3d at 1140.

Even where the indictment "fails to provide the full panoply of such information," a bill of particulars "is nonetheless unnecessary if the information is available through some other satisfactory form, such as discovery." *Id*. (internal

46

quotations omitted). Thus, in deciding whether a bill of particulars is appropriate, the Court considers "the complexity of the charges, the clarity of the indictment, and the degree of discovery available to the defense absent a bill." *United States v. Coffey,* No. 92-cr-203, 1993 WL 424239, at *10 (N.D. Ill. Oct. 19, 1993) (internal citations omitted). The decision to require a bill of particulars rests within the sound discretion of the Court. *United States v. Canino,* 949 F.2d 928, 949 (7th Cir. 1991).

In light of the discovery available and the nature of the offense, this Court finds that the indictment in this case is sufficiently detailed to inform Defendant of the charge against him. It sets forth the specific threat that forms the basis of the charge, the time at which the threat was made, the means by which it was transmitted, and a citation to the statute violated. *See* Indictment [16]. In addition, throughout the pretrial process, this Court has ensured the government's compliance with its discovery obligations under the Federal Rules of Criminal Procedure. Such discovery "further informs [Defendant] about the evidence against him and the Government's likely theories of the case." *United States v. Tomkins*, No. 07-cr-227, 2012 WL 1357701, at *1 (N.D. Ill. Apr. 19, 2012). To the extent Defendant seeks a bill setting forth additional facts, "such evidentiary detail is beyond the proper scope of a bill of particulars." *Esteves*, 886 F. Supp. at 646-47; *see also United States v. Burge*, No. 08-cr-846, 2009 WL 3597950, at *8 (N.D. Ill. Oct. 27, 2009), *aff'd*, 711 F.3d 803 (7th Cir. 2013); *United States v. Berumen,* No. 87-cr-

20012, 1990 WL 304210, at *2 (N.D. Ill. Sept. 24, 1990).  Accordingly, Defendant's motion is denied.

### E.   Defendant's Motion to Unseal Pertinent Documents, Subpoena Medical Records of Dr. Carl Wahlstrom, and Order Dr. Wahlstrom to Amend His Diagnosis [85]

On October 28, 2015, Defendant's former attorney requested that this Court issue an ex parte order to appoint a psychiatrist, Dr. Carl Wahlstrom, on Defendant's behalf.  *See* Def.'s Mot. [28].  This request was granted on November 4, 2015 in a sealed court order.  *See* Order [31].  Defendant originally requested that copies of his medical records from Dr. Wahlstrom be turned over in discovery and that the order granting his evaluation be unsealed.  Defendant also requested that the Pretrial Bail Report [5] issued on July 14, 2015 be unsealed.

At the evidentiary hearing, both the government and Defendant agreed that, in the interest of protecting Defendant's privacy, the above-named materials should remain sealed.  Tr. [145] 313:10-314:21.  The parties further agreed, however, that the government would provide complete copies to Defendant for his personal review. *Id.*  Defendant's Motion to Unseal Pertinent Documents and Subpoena Medical Records of Dr. Carl Wahlstrom [85], therefore, is granted in part and denied in part, as agreed in open court.  Defendant's Motion to Order Dr. Wahlstrom to Amend His Diagnosis [85] is denied.

### F. Defendant's Motion to Rebuke and Sanction the Government and Defendant's Former Public Defender for Unauthorized Disclosure of Privileged Physician-Client Medical Information [85]

Defendant argues that the disclosure of Defendant's medical information constituted a violation of the Health Insurance Portability and Accountability Act ("HIPAA") and requests that the Court sanction the government and Defendant's former counsel $5,000 each. Defendant's request is denied. Defense counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). The record before this Court does nothing to rebut this presumption, and Defendant's demand lacks a sufficient basis in law or fact.

### G. Defendant's Motion to Compel Discovery [85] and, in the Alternative, Oral Motion to Suppress Evidence for Destruction of Exculpatory Evidence

Special Agent Timothy Walther testified—during both the grand jury proceedings and evidentiary hearing—that the FBI first learned of Defendant's conduct as a result of an email that was sent to the Illinois State Police FOID Department, which was then forwarded to the FBI. Tr. [144] 21:19-20; Def. Ex. 35 at 16.

During a status hearing held on October 11, 2016, Defendant requested that this email be produced in the course of discovery. Tr. [95] 20:3-24. The government objected to such production and declared that it does not intend to use the email in its case-in-chief. *Id.* at 21:2-22:14. The Court ordered the government to determine

if the email was still in existence, and if so, submit an unredacted copy for *in camera* inspection. *Id.* 24:24-25:8.

Counsel for the government subsequently learned that the initial email sent to the Illinois State Police FOID Department was not retained, and that the identity of the sender remains unknown to law enforcement. Counsel for the government also learned, however, that an Illinois State Police employee sent an email to the FBI conveying the substance of the original report along with a link to Defendant's Facebook page. The government submitted a redacted[14] copy of the FBI "Internet Activity Report" documenting this email to the Court for *in camera* inspection.

Having concluded its *in camera* review, this Court finds that Defendant is not entitled to the "Internet Activity Report." Discovery in criminal prosecutions "is limited," *United States v. Neal*, 611 F.3d 399, 401 (7th Cir. 2010); and courts possess "broad discretion with regard to discovery motions in criminal cases." *United States v. Delatorre*, 438 F. Supp. 2d 892, 900 (N.D. Ill. 2006), *aff'd sub nom. United States v. Benabe*, 436 F. App'x 639 (7th Cir. 2011). Federal Rule of Criminal Procedure 16 outlines "the minimum amount of discovery to which the parties are entitled," although the rule does not limit the "judge's discretion to order broader discovery in appropriate cases." Fed. R. Crim. P. 16, Advisory Committee Note. Additionally, pursuant to the Supreme Court's ruling in *Brady v. Maryland*, 373 U.S. 83 (1963)*, the Government "has a duty to disclose evidence favorable to the defense (either

---

[14] Specifically, the government redacted the identifying information of the Illinois State Police employee who made the report to the FBI. Such redactions are amenable to the Court and have no bearing upon the Court's ruling on Defendant's Motion to Compel [85].

exculpatory or that which could be used for impeachment) where such evidence is material either to guilt or punishment." *Delatorre*, 438 F. Supp. 2d at 901.

The "Internet Activity Report," however, reveals no information favorable to the defense. Nor does it fall under one of the disclosure categories outlined in Rule 16. *See* Fed. R. Crim. P. 16(a)(1). The report does not contain an oral, written, or recorded statement of Defendant; Defendant's prior record; the results of physical or mental examinations or scientific tests or experiments; or a summary of expert witness testimony. *See id.* Moreover, because the report merely memorializes facts already known to Defendant (that Illinois State Police received an email concerning Defendant's Facebook page and subsequently notified the FBI), the report is not material to preparing a defense. *See id.* at 16(a)(1)(E)(i). As a result, Defendant's Motion to Compel [85] is denied.

Upon learning at the evidentiary hearing that the initial email sent to the Illinois State Police FOID Department was not preserved, Defendant orally moved to suppress all evidence against him as a remedy for what he deems the destruction of exculpatory evidence. To prevail on a due process claim based upon destruction of exculpatory evidence, however, Defendant bears the burden of establishing that: (1) the government, in bad faith, destroyed or failed to preserve the evidence; (2) the exculpatory value of the evidence was apparent before the evidence was destroyed; and (3) the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means. *United States v. Andreas*, No. 96-cr-762, 1998 WL 214666, at *3 (N.D. Ill. Apr. 22, 1998), *aff'd,* 216 F.3d 645

(7th Cir. 2000) (citing *Arizona v. Youngblood,* 488 U.S. 51, 57-58 (1988); *California v. Trombetta,* 467 U.S. 479, 488-89 (1984)). Bad faith is determined by whether the government knew the exculpatory value of the evidence at the time it was lost or destroyed. *See Jones v. McCaughtry,* 965 F.2d 473, 477 (7th Cir. 1992). To show bad faith, the defendant "must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence." *McCaughtry,* 965 F.2d at 477 (citing *U.S. v. Nesbitt,* 852 F.2d 1502, 1520 (7th Cir. 1988)). Defendant has made no such showing here, and his oral motion is accordingly denied.

## H. Defendant's Motion to Show Cause on Subject Matter Jurisdiction [97]

According to Defendant, internet threats are covered by state criminal law. *See* 720 ILCS § 5/26.5-3 ("Harassment through electronic communications"). Moreover, Defendant claims that under the FBI's Domestic Investigations and Operations Guide, the federal government does not possess subject matter jurisdiction over an offense unless a request for investigative assistance is made by an appropriate state official. Defendant requests an order directing the government to disclose "the form, content and identity of the State official who requested the FBI for assistance." Def.'s Mot. [97] 1.

Defendant misunderstands jurisdictional precepts. The fact that Illinois maintains its own criminal threat statute is immaterial. Such duality is merely the product of "two sovereignties, deriving power from different sources, capable of dealing with the same subject matter within the same territory. Each may, without interference by the other, enact laws to secure prohibition." *United States v. Lanza,*

260 U.S. 377, 382 (1922).  Where a defendant "in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences,'" and thus can be prosecuted by either government (or both). *Heath v. Alabama*, 474 U.S. 82, 88 (1985).

Furthermore, federal jurisdiction is conferred by the Constitution and congressional statute, not internal operation guides of executive agencies.  *United States v. Wahi*, 850 F.3d 296, 299 (7th Cir. 2017).  Defendant is charged with violating 18 U.S.C. § 875(c).  District courts "*always* have subject-matter jurisdiction based on *any* indictment purporting to charge a violation of federal criminal law."  *United States v. Bjorkman*, 270 F.3d 482, 490 (7th Cir. 2001) (emphasis in original); 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.").  Defendant's unfounded motion, therefore, is denied.

## I.     Defendant's Motion to Dismiss for Lack of Territorial Jurisdiction [101]

Finally, citing Article I, Section 8, Clause 17 of the U.S. Constitution, Defendant asserts that the federal government can only exercise jurisdiction with the "cession" or "consent" of a state.  Def.'s Mot. [101] 3.  Defendant argues that, because there has been no "cession" or "consent" by the State of Illinois, the federal government lacks jurisdiction over his case.

Defendant's constitutional construction is misplaced.  Article I, Section 8, Clause 17 states that Congress shall have the power to enact:

> exclusive Legislation in all Cases whatsoever, over such
> District (not exceeding ten Miles square) as may, by
> Cession of particular States, and the Acceptance of
> Congress, become the Seat of the Government of the
> United States, and to exercise like Authority over all
> Places purchased by the Consent of the Legislature of the
> State in which the Same shall be, for the Erection of
> Forts, Magazines, Arsenals, dock-Yards, and other
> needful Buildings.

U.S. Const. art. I, § 8, cl. 17. This clause—often referred to as the "District Clause" or "Enclave Clause," depending upon the reader's focus—applies to the District of Columbia and federal enclaves. It allows, pursuant to proper "cession" or "consent" by relevant states, the grant of "exclusive" legislative power to Congress over the District of Columbia and federal territories. *See Black Hills Power & Light Co. v. Weinberger*, 808 F.2d 665, 668 (8th Cir. 1987).

Defendant, however, cites the clause for a countervailing proposition—that the federal government lacks *any* jurisdiction over *any* territory not so ceded. Not so. The Enclave Clause does nothing to limit Congress' concomitant authority to regulate interstate commerce, *see* U.S. Const. art. I, § 8, cl. 3, including the use of the channels of interstate commerce; protection of the instrumentalities of interstate commerce, or persons or things in interstate commerce; and activities substantially affecting interstate commerce. *United States v. Morrison*, 529 U.S. 598, 608-09 (2000). Congress lawfully enacted 18 U.S.C. § 875(c) pursuant to this authority. Defendant's motion, therefore, is denied.

**J.     Defendant's Motion to Extend Trial Date [85]**

Given the case's current procedural posture, Defendant's motion to extend his trial date from November 16, 2016 to January 16, 2017 is denied as moot. This Court shall set a trial date at the next status.

## III.    Conclusion

Defendant's timely pretrial motions, including: (1) Motion to Suppress Evidence [89]; (2) Motion to Dismiss the Indictment [89]; (3) Motion to Void 18 U.S.C. § 875(c) for Vagueness [89]; (4) Motion to Unseal Pertinent Documents, Subpoena Medical Records of Dr. Carl Wahlstrom, and Order Dr. Wahlstrom to Amend His Diagnosis [85]; (5) Motion to Rebuke and Sanction the Government and Defendant's Former Public Defender for Unauthorized Disclosure of Privileged Physician-Client Medical Information [85]; (6) Motion to Show Cause on Bill of Particulars [97]; (7) Motion to Compel Discovery [85] and, in the Alternative, Oral Motion to Suppress Evidence for Destruction of Exculpatory Evidence; (8) Motion to Show Cause on Subject Matter Jurisdiction [97]; (9) Motion to Dismiss for Lack of Territorial Jurisdiction [101]; and (10) Motion to Extend Trial Date [85], are denied for the reasons stated above.

Date:  May 31, 2017

ENTERED:

John Robert Blakey
United States District Judge